Good morning, Your Honors. May it please the Court, my name is Kristen Boyles, and I represent Appellants National Wildlife Federation in this case. Mr. David Cummings, representing the Nez Perce tribe, will share three minutes of my time this morning, and I would like to reserve two minutes for rebuttal. I have three points this morning. First, I will discuss the Army Corps' failure to comply with water quality standards for temperature, despite the Army Corps' admission that operation of the Lower Snake River dams adversely affects water temperatures. Second, I will discuss the errors in the Army Corps' belief that because it need not comply with the Clean Water Act for temperature, the Corps need only look to the Endangered Species Act for its legal obligations. And third, I will address the fact that Clean Water Act Section 313 requires the end result of compliance with Let me ask you a question on that last one. Absolutely. If it were to turn out that the existence of the dams, but not any method of operation of them, just the existence of them per se, caused an exceedance that violated Washington law, or caused an exceedance of the Clean Water Act, does that mean just the running of the dams, or does that mean, like, the fact that you put a dam there? Your Honor. The fact that the Federal Government, by Congress, by statute, put dams on the river. The Federal Government, by statute, put dams on the river, and if it turned out that only the existence of the dams caused some water quality standard violations, then that would be a very different situation than we have here. What's the answer if that were the situation? Your answer, Your Honor, is that in Section 313, if you got to that step, there is a process for seeking a presidential waiver for compliance with some water quality standards. What's the answer in this litigation if that were the case? Assume that was done? No. Assume that there's no presidential waiver and a conclusion that the dams themselves are causing exceedance. I'm asking you, what's the result in this case, then? If the dams are causing exceedance. If there's nothing else that they could do in their operation, which is what the Government said and which the trial court on Round 2 seemed to think, but assume that's right for a moment, even though that's not your case, but assume that the dams themselves caused the temperature exceedance. What's the result? I believe, Your Honor, that if that were the case, that Army Corps would be appropriate to seek that presidential waiver and then get the waiver of the water quality standards. If they didn't have a waiver, which they didn't have in this case. Then I think they have acted contrary to Section 313 and they would have to seek such a waiver. There is an out for them to be able to seek such a waiver. But they haven't done that. And they haven't gotten even to the point of doing that because what they haven't done is admit they even have a problem with respect to temperature. Okay. That was on my mind. Let's go back on that point on not admitting that they have a problem as to temperature. Maybe I misread that, but I thought maybe they didn't admit there's a problem, but they admitted that the temperature is elevated. Is that correct? They do admit that the operation of the dams shifts the temperature regime. In excess of? In excess of the standards, which are both the numeric standards and the narrative standards for Washington State. Right. The record also has information from EPA's temperature study, which shows that the existence and operation of the dams causes temperature violations for more days and for longer duration than it would without the dams. So then it's a legal issue for us since that's the, we don't have to figure out whether somebody's relying on best scientific evidence like we do in most of these cases. We just know that the temperature is elevated. We need to figure out what the legal significance of that is vis-a-vis the government's obligations, correct? That's right, Your Honor. And I think what's illuminating is to think about how we got here. In February of 2001, the district court ruled that the prior two records of decision showed that the Army Corps had violated the water quality standards for both temperature and dissolved nitrogen, and sent those decisions back. And that's when we ended up with the May 2001 decision that we're talking about here. In the May 2001 decision, the Corps addresses dissolved nitrogen and the Corps addresses temperature. And if you will contrast those discussions, it's very illuminating. For nitrogen, the Corps admits that it has violation problems, talks about monitoring, talks about structural changes, operational changes to address that scenario. But if you look at the temperature discussion, which is on page C-8 of the decision that we're talking about here, which is administrative record 218, excuse me, excerpts of record 218, you'll see that what they say for temperature is we are not causing this problem, therefore, we do not have to go any further than say it's not our problem. But the record undercuts that conclusion, the record that they must rely on. Yes, sir. Let me throw something at you, which has really thrown me for a loop. Because as I understand it, your argument relates to the fact that there's violations of Clean Water Act as prescribed by Washington and Idaho law. Idaho and Just Washington, Your Honor. Just Washington. Now, as I read Judge Frye's last order in this case, Judge Frye talks about the fact of the Obligation of Endangered Species Act. I'm reading from ER 822, page 12 of her opinion. She talks about Section 7 Endangered Species Act and the obligations of the service's biological opinion. She references her decision around the 2000 BIOC and around the 2001 R.O.D. interpreting the BIOC. Then this is what throws me. She goes through on how the service is going to meet those obligations in that context. Then says specifically, this is not a Clean Water Act enforcement action. This is not an Endangered Species Act. In trying to sort this out in my own mind, what apparently she's running here, or trying to run, is the BIOC and the R.O.D. on this side, and the Endangered Species Act maybe in the middle somewhere over here, because that's what the BIOC is all about and the critical habitat. She runs a Clean Water Act on this side. Once she satisfies the BIOC, the R.O.D., and the Endangered Species Act, and determines that there are elevations in water and whatever, and says you've done it, she discounts then the requirement to satisfy independently the Clean Water Act. It seems to me we've got agencies clashing with agencies and laws clashing with laws, because she definitely says this is not a Clean Water Act case and not an Endangered Species Act. So how do – am I – am I cockeyed on this, or how do we sort this out? No, Your Honor. I think you're reading Judge Frye's opinion on those pages, sort of 12 to 14, as the applicable discussion, correctly. And it is a confusing set of reasoning. But I think she was – I think I understand the reasoning. The question is where's the error here? See, we're reviewing her decision for error.  I agree with that.  I mean, you've satisfied the R.O.D. with your science and whatever, and you've satisfied what you can do relative to temperature and gas, and – but the Clean Water Act stands hanging out here, which seems to be in conflict with that. That's right. And the Clean Water Act has separate obligations. While the Endangered Species Act and the compliance with the biological opinion may set a floor for what you need to be talking about jeopardy to species, it does not at the same time set a ceiling. I agree with that. But if you did not bring a Clean Water Act action, maybe that's tomorrow, then how can you have the conflict with the Clean Water Act trump the actions in interpreting the BIOP and the R.O.D.? The BIOP and the – the biological opinion is solely under the Endangered Species Act. We did bring a Clean Water Act case challenging the Federal Government's failure to comply with Section 313, and that is under Administrative Procedure Act review. Then she's wrong. She means, I think, that we didn't bring a citizen suit claim under the Clean Water Act, which is a different form of pleading. But we did bring – I mean, this whole case is about the Clean Water Act and the violations that we allege of Section 313. So the question – This is not an enforcement action under the Clean Water Act, which, as I understand it, you're not allowed to do as to state water standards. The Federal Government could do it, but a citizen can't do it on the state water standards. But it's a challenge to the administrative action in accepting and making this record of decision. That's right, Your Honor. And that challenge falls along a long line of cases from this Court saying that is the way you challenge Federal agency actions. I understand that there's some cases that, you know, if the agency said it was violating the state water standard, or if they were changing by what they were doing, they were admitting they would be violating a state water standard, then it could seem like the agency decision is contrary to law, which is one of the grounds for APA review. But here they're not really saying we admit we're violating the state water statute. They say – well, it's a little confusing, I guess, what they're saying. But they seem to be disclaiming that they're violating the state law. Now, is the question whether their interpretation of the state law is arbitrary and capricious? Or is that a question of law? The judge – did the judge just have to decide if they're violating the state law? The judge can't take evidence about this. It's not a trial – right? Right. I think this – So how can the judge make a determination they're violating the state law on this record? I think you do it in the way you do all Administrative Procedure Act review of record cases. You look at the decision that the Army Corps made, again on page C-8 of its opinion, that it was not causing exceedances of the temperature standard. And then you go back and look at the record, and you see whether the record supports or fails to support that ultimate conclusion. But isn't this a collateral attack on the process in being? The process in being is that when they recognized the problem with the gas and the temperature, they did the buyout. Recognizing further problems, they went through the process and did the 2001 rod. Now, there's been a lot of time and effort, and I don't know if it's right or wrong. I mean, that's what happened. And it's down this current of the Endangered Species Act. By collaterally bringing in, you now also must satisfy the Clean Water Act, but not under the Clean Water Act. It's a collateral attack on that process when, in fact, the process did satisfy whatever there was to be satisfied with water temperature if it was right, temperature and gas under the other circumstances. How can we do them both at once unless you have both challenges at issue? Your Honor, I think you can do them both at once. And I think it's incorrect to say that the biological opinion was originally set to sort of look at the Clean Water Act issues. That's exactly right. It was not. It was not. So how can you bring the collateral attack under the Clean Water Act to try to challenge this process? It sounds like we're trying to satisfy two different things at once. Isn't it a different cause of action under a different set of facts that have to be developed? We challenge the final decision, the final agency action here is the decision in 2001 of how they are going to operate the river system. That decision has to comply with quite a number of laws beyond the Endangered Species Act, which is what the biological opinion, a separate consultation process under the ESA by a separate federal agency, not the Army Corps, engages in. The Army Corps in the May 2001 decision says how it's going to comply with the Endangered Species Act. It needs to say how it's going to comply with the Clean Water Act. It also talks about lots of other acts, the Historical Preservation Act. Maybe I saw it too simply, so tell me if I've gone wrong. I read the challenge here, the legal challenge, to be a legal determination that we need to make as to the intersection between the endangered species and the clean water and whether you could simply rely on determinations under the endangered species and then say you didn't have to address the clean water. Is that the legal issue? That is certainly one aspect of the legal issue. I think they're all... What is your best authority for the fact that the Army Corps in its decision can't rest on the ESA analysis but needs to go to the Clean Water Act, which in turn puts you into the state regulations? Four reasons, Your Honor. First, and I said this to Judge Brunetti, it's a document from a separate federal agency. They're pointing outside their own authority. You mean the Army Corps? The Army Corps is pointing to what the National Marine Fisheries Service has done. Second, what they have agreed to are neither mandatory steps nor are they funded. And that's very clear if you look at the decision itself. And so they are not, in fact, taking any steps to get to anything that looks like compliance with the water quality standards. Third, there are additional actions from a Clean Water Act perspective that are not in the biological opinion. And that is made very clear by the National Marine Fisheries Service itself in the biological opinion. They say that at page V-19. And EPA, when it was reviewing that decision, that there are additional actions that are Clean Water Act issues, but we don't put them in this Endangered Species Act jeopardy document. And what are those additional actions that the record shows could be taken that aren't being taken? Your Honor, they are, have been identified in various places in the record. Two places I would point you would be the Corps' 1995 System Operation Strategy Alternative. That's at page 428 of the excerpt of the record where they talk about running the river in a certain way with drawdowns and lower pools and different hydrographical models. And the second place I would point you would be page 764-65 of the excerpt of the record, which is a Clean Water Act compliance memo from the Clean Water Act team. It has a list of things that could be done to address temperature. There are other things throughout the record, but those are ones to look at. Finally, Judge McKeon, I said I had four points, and my fourth is that that biological opinion that they rely on has been held invalid under the Endangered Species Act itself by another district court. And so even if you could do that, which I would contend you cannot. That's still pending, as I understand it, from what the briefing says. The biological opinion has been held invalid. It's not still pending. That legal decision is final. What is going to be the next step, obviously, in continuing this process? But there's no appeal pending from that. There's no appeal because the judge has kept jurisdiction while the agency goes back to the Nez Perce tribe. Okay. Do you want to reserve some time for Mr. Cummings? Yes. Thank you. Yourself. Good morning, Your Honors. May it please the Court, my name is Dave Cummings. I have the honor of representing the Nez Perce tribe in this case. I want to make a few brief points. First is that the issue regarding existence and operation of dams is and has been a red herring throughout this case. Judge Fry in her second decision on summary judgment referred to the Idaho Fish and Game decision showing that there is no distinction in the statute between exceedances caused by existence of the dams or operations. And so there is no basis for that. I want to share my brief time with you, though, in looking at the actual decision that the Court made. And I think this helps answer the questions that were being asked about this intersection between the Clean Water Act and the Endangered Species Act. Clearly, in page C8 of ER 218, the Court, in two sentences, that's the heart of the Court's Clean Water Act decision. The Court decided on its own to do all of this decision making in one document. So then we were seeking judicial review of this document for its compliance with Section 313. What the Court said, even after these two years of litigation, was, based on our analysis of the existing data, the Court has concluded that the operation of the main stem dams on the Snake and Columbia Rivers has no significant impact on water temperatures based on this information. We conclude that the operation of the dams is not causing temperature exceedances. What it asks you, and what we asked the District Court, and where we think the District Court erred, was that it didn't ask the questions of, are these two sentences supported by the decision itself? I think if you'll look, the answer is no. The next question is, is this supported by the administrative record? I think the answer, again, is no. Some of the information and the sites that Ms. Boyles provided. The next question is, can this decision be squared with what the District Court had previously held in saying that, based on the District Court's review of the 1995 and 1998 records, that the core stamps were a significant cause of these exceedances? Those statements can't be squared. So one additional thing. You can only ride the earlier District Court opinion, though, so far because it didn't have the current record. In part, what I thought the District Court was saying was, look, you haven't even addressed the Clean Water Act, and this temperature issue, and state law, so I'm sending it back. Address it. Then they address it. They go back to the District Court again, and the District Court says, oh, okay, I accept what you say. Since the District Court knows what it meant in its first ruling, it seems to me you can't go too far relying on that to contradict this. Right, and that leads us to the next question is, has something changed between that time of review and the court's new decision? Again, the answer is on C-8 and C-9. On C-8, the court says, we're going to operate Dorsak Dam upstream, essentially the same way we have in the past, with a minor tweak to fix the hatchery outtake or intake. And the only other thing the court points to is this Appendix B, and that's on page C-9, which is part of a water quality plan. Even on C-9, though, the court admits that this is a plan to develop a plan not designed to achieve water quality standards on any particular time schedule. If they had said, we acknowledge that the existence and operation of these dams causes exceedances, and here's our plan of how we're going to get rid of the exceedances over the next three years or X months or five years or whatever, then you'd say that would be unassailable or that would be okay or possibly, but that's not what they did? What we've been looking for from the outset has been, and the tribe has been involved in this since 1997 when EPA and some of the state agencies raised their own concerns, which was simply that the court take actions to achieve these water quality standards. Some of them may not be able to happen tomorrow, but there can certainly be timelines imposed. If the court goes back and finds out, geez, there's nothing possible we can do, then, as Ms. Boyles described, there is an escape valve. They can go and ask the President for an exemption. All right. Thank you. We'll hear from the government. Good morning. Yep, still morning. Good morning. My name is Sylvia Quast. I'll be representing the Corps of Engineers this morning. I'll be speaking for 15 minutes and giving five minutes of my time to the intervener at police, potlatch, and other river users. Ms. Beal will be speaking on their behalf. Could you keep your voice up just a little bit? It's kind of hard to hear. Sorry. No problem. Okay. Thank you. Better? Okay. I'd like to go right to Judge Gould's question about how a district court is supposed to determine that there's a violation in a case like this. It's key to remember that we're not talking about a Clean Water Act enforcement action here. We're talking about an Administrative Procedure Act action. And the question, what the court looks at in an Administrative Procedure Act case is the administrative records before the agency and what that administrative record tells it in terms of these violations. What does the administrative record tell us here? What the court has said and what the court clearly understands is that the existence of these dams, the mere existence of the dams causes a temperature shift. And what the models that the court looked at all agree on, they differ on a lot of issues, but they all agree on is that there's a temperature shift in the fall for approximately a couple of weeks. Water in the river is warmer than it would be under natural conditions for a few weeks in the fall. Okay. What's the court going to do about that? Well, one thing it says about operations versus existence is that with regard to operations, the operations of these four dams themselves aren't going to make much of a difference to that temperature shift because they're run-of-the-river dams. That means that there isn't this thermal stratification where you can draw cold water from the bottom to cool the river. However, the court does have an option that is tested and true here, which is releases upstream from Dworak Dam, which does have this thermal stratification in which in 1992, in response to these concerns about temperature, they installed a system whereby they could selectively withdraw from that system. They started doing that in 1992, and that's been effective, especially as the summer goes on. There's less water in the river, more cold water proportionately coming out of Dworak Dam, and it has a significant effect on cooling temperatures in the river. Let me ask you. I think I deluded myself into thinking that this might not be as complicated as some of the other environmental cases we have this week with all the records. We've read, you know, we've done spotted owls already. Now we're going to have to do salmon and others. You're getting all the biggies. So the question really was this. Maybe you can explain this because I understand the theory and I understand the issue of the dams versus no dams and whether the operation actually does elevate the temperature. But on what I thought was a legal issue raised by the appellants, could you explain what you think the obligation was in the Corps' decision to factor in the Clean Water Act and the state's standards and whether they did it or whether they have any obligation to do it? The Corps is not denying here that it has an obligation to comply with those standards. We've made that very clear in our brief, and I'm a little surprised to hear appellants suggesting that we're disagreeing with that at this point. That was made clear. That's discussed in the record. The Corps goes on to talk about what it's doing vis-a-vis that issue, and that was the part I was just getting to. I was giving you the background on this distinction between existence of the dams themselves, which are congressionally mandated. This is not something the Corps can turn around tomorrow and say, okay, let's breach the dams. That's something that has to be done, I think anybody can understand this, by congressional authorization. It can't just proceed with something like that. That's in process, looking at options on that. That may very well be. It's always hard to say with Congress. But what it goes on to do is to talk about operations. What can it do on the operational front? And this is all discussed at ER 486 and other portions of the record, but it's summarized neatly there. There's not a whole lot with respect to... You have to comply with the Clean Water Act, which in turn means you need to comply with the Washington standards. Do you agree with that? We're not disputing that here, if that's correct. I'm trying to get the framework right. I understand that. Put your facts in there. So you have to comply with the Clean Water Act and you have to comply with Washington standards. Is the ultimate conclusion of the Corps, because of the nature of just these four dams, vis-a-vis the overall system, that you're not in violation, that you meet Washington water quality standards? Does the decision say that? The decision does not say that directly. What it does say is what we're going to do is address the area where we see a concern by taking those Dwarjak releases that I was just talking about and extending them into the fall period to address the area where we know we've got an issue with temperature. We're going to do that, number one, more cold water releases in the fall and try that on an exploratory basis. I do want to stress that because it's clear in these environmental cases that they are complex and you have to make sure that what you're doing to deal with one problem, temperature issues, isn't going to create difficulties in other areas with regard to salmon. But in this particular instance, we're dealing with salmon and water and gas. That's correct. In other words, we're running up that road through the Endangered Species Act under the existing complexity of the fixed dams, budgets, et cetera. So you address the temperature and gas relative to the effect on the salmon. What's happening on this side is, but wait a minute, that doesn't meet the Clean Water Act and that's why I asked the question. Judge Frey flat out said this is not a Clean Water Act enforcement. So if you're satisfaction with regard to the salmon, they're going to survive and you'll satisfy the critical habitat and all the rest of the Endangered Species Act, but for some reason there may or may not be a Clean Water Act issue, how do we resolve it in this case today? This thing is sliced so thin every time we see these cases. For years we see a little slice, another slice. Tomorrow there's going to be a whole bunch of other lawsuits. So how do we decide this case today relative to this thin slice we're looking at? The way that this case should be decided today is to determine that there hasn't been a violation of the APA by the Corps here. And the reason for that is the record. That's fine. But how do we address the issue over here, this selective argument that says, but wait a minute, you haven't satisfied the Clean Water Act, which you admit you have to. How do you reconcile that? But in fact, the Corps is looking at the Clean Water Act, has addressed the Clean Water Act. And in fact, the issue, Your Honor mentioned gas, the issue of total dissolved gas has actually fallen out of this. The Corps said, we have concerns. There's a conflict, a potential conflict with the ESA here. Here's what we're going to do. Here's how we're dealing with it. Here, with regard to temperature, the Corps has said there's an existence, there's a problem with the existence of the dams in terms of it creating a temperature shift. Operation of these four dams won't change that. We've looked at those options. We've thought about it. All the agencies have worked together. The appellants try to suggest that the Corps has been sitting back passively and waiting for manna from heaven, from nymphs. That's not true. All the agencies are working together, and also state agencies and the tribes. And they're saying, here's what we can do to deal with it. Here's what we see. We're going to take these Dworak operations. We're going to address the issue that we see based on the science that we see after looking at these models. And we're also going to have more cool water releases. And this is how we're going to deal with it. And there's nothing in the record to suggest that that won't work. And there's nothing the other thing is if the appellants could come in to you and say, look, there are these other options that were in the record. They're feasible. The Corps didn't adopt them. But in fact, they can't do that. I'd be happy to go on to address that. Judge Gould? I have to acknowledge I'm still confused about a number of issues in this case. And it will require a lot more study. But just as background, can you tell me why it is that the appellants apparently don't have a right to bring a citizen suit under the Clean Water Act for state water standards? Is that like a historical anomaly? Or why is that? That was a decision by this court, of course, that they couldn't bring Clean Water Act citizens' enforcement actions. I think the reason for that is because the citizen suit enforcement provision in the Clean Water Act, which is, as I recall, Section 505. I'm afraid I can't give you the USC site off the top of my head. But that specifies very specific types of violations under the Clean Water Act that citizens can come in and enforce. And state water quality standards are not one of those things. I was making a discharge from a point source. Right. Discharges from point source, classic citizen suit case. Exactly. And those sorts of things are encompassed. This sort of thing is not. My other question. What the court didn't do, as I read the briefing, was it didn't say, we are violating the state law and we're going to correct it. Or it didn't say real clearly, we're not violating the state law. Well, it seemed to me it was kind of ambiguous. Like what the court was saying is, hey, we're doing everything we can. But can you shed some light on that? Did the court say it was that dams operations were in violation of state law or did they not say it? Well, I think the thing that I would point the court to in that regard is on page 486 of the excerpts of record, where the court discusses historical data and other monitoring it has done. And it says, the dams are not the sole cause of the exceedances of state water quality standards in the Lower Snake River. So it does, there is a suggestion there that there is this temperature shift and that there are some exceedances, but that they're not the sole cause of those exceedances. It goes on to say then, okay, this is the problem we have with the existence of the dams. We're stuck with this. We've got those dams there. It's congressionally mandated. What can we do from an operational point of view? It goes on to explain, not a whole lot, but we do have some options with regard to Dworak, and we're going to make use of the options we have here to do something about this issue. Well, I guess that still doesn't answer the question. I mean, I feel like we're kind of literally swimming around the bottom line here. And that is, yes, the dams themselves are a cause, and there's other causes as well. But has the Corps made a determination in there that the operation causes the exceedance of the state water quality standards? Do they make a statement one way or the other? They've made a statement that they don't believe that the operations, in contrast to the existence, cause the exceedances. Are there causes, exceedances or temperature shift? The temperature shift that we're talking about, this fall period, is because of the existence of the dams themselves, not because of operations. And in fact, all the operations that are contemplated and that have been put into place in the 2001 R.O.D. are about bringing temperature down, about sending cold water down the river at the important time, at sending colder water during the later summer months. There used to be an issue about a fish hatchery in connection with Dworak, and you couldn't send water that was too cold. It wasn't good for the young fish. They've changed things around so they can send pulses of colder water down the river to deal with these temperature exceedances. Another concrete, so to speak, action that they've taken on the river is to make sure that there's a place of very high priority in making sure that there's enough water in Dworak Reservoir at the end of June so they've got the cold water to send down the river later in the summer, in the fall, when there's clearly an issue, when there's clearly a temperature shift. And all those things are suggested there. There's nothing else that's been pointed out as a way of dealing with this issue of temperature that's feasible. The Appellant Wildlife Federation, at the start of Council's argument, pointed to a few things in the record I haven't been able to turn to them, but said that they give other things that could be done. The two things that they pointed to in their brief are the 1995 Systems Operation Review EIS, which discusses something that is called the Natural River Operation Strategy. The reality is this isn't an operation strategy at all. It's talking about breach of the dams and bringing the dams down and looking at that as an alternative. That's not an operation. That's tearing them down. So that's not, in terms of what the court is looking at here, this action, this rod, that is not an option. They also submitted a declaration below from an expert offering a variety of measures to, supposedly, to decrease water temperature. One of them included, for example, monitoring of temperature. Well, monitoring of temperature doesn't bring water temperatures down. Other suggestions they made involved spilling more water over the dams. Well, our scientists came back and said, look, the science isn't there to say that that will It's going to cause problems in the total dissolved gas area, which we just thought we've resolved here. May I ask a naive question here? Yes, certainly. If the complexity of the dams and the attempt to allow the salmon population to survive and those duties are looked over here, it seems to me there's certain parameters you're arguing that are natural and cannot be changed. In other words, you put your science to work, and given the conditions, you do so much. On this side, there seems to be the Clear Water Act by its language, which is not operational. It's not natural. It's just the Clean Water Act. And it sounds to me like what's being said here is you can take that word of the law, and we have to adhere to it, but you can't apply it to this dynamic situation entirely, 100%. So what we do is we try to do the best we can, given the salmon, given the dams, but we cannot word for word apply. For instance, we can monitor the temperature every day, and maybe we could get it down to a certain point every day that would absolutely comply with the Clean Water Act, but it wouldn't work under the dam. Is that what we're dealing with here? Well, I think the thing to remember is that there actually are operations that have been put into place with the 2001 rod to deal with the temperature shift that we're talking about. I understand that. But the key is, if you've done that, what's the problem with the Clean Water Act? There seems to be another fallback by those who are looking at you saying, but you still don't satisfy the Clean Water Act. So it seems like it's this statutory language and requirement versus this operation that involves all these people and all this stuff constantly trying to make the system work. And that's where I'm having trouble reading through this, trying to figure out what's the answer other than tearing the dams down. And then you're saying that won't even work anyway because it won't be as good as it is now. Well, there's an issue about one of the models suggests that without the dams, river temperatures would actually be higher. So there's some question about whether that would create more problems for the salmon, for example, which is all part of the mix. I'm trying to figure this out. I think the way that the thing that I would focus on, Judge Brunetti, in thinking about this is that this is an administrative procedure act, action ultimately. And the question is, have they followed the procedures they need to? Have they taken a careful look at this question? Are they doing everything they can? Is there anything in the record that indicates they're going down the wrong path, I hear at all, or that there's something more they should have done that they didn't do? Well, I mean, that's really – it seems to me Judge Frye kind of skirts the question because she says, well, they have to do something – they can't – what they did was not inconsistent with the Clean Water Act. That's a little different than saying they needed to comply with the Clean Water Act as part of this decision. Do you see the difficulty I'm having? Right. I do understand that. I think that Judge Frye just – maybe that's just a slightly inartful way of phrasing it. But we're still – even if she were wrong on that, we're sort of back trying to figure out if, as you said, you have to comply with the Clean Water Act, then your decision has to – the rod has to be in compliance. Is that correct? Right. And I think what she's focusing in on here is what are the operations that are being authorized by this rod? These are operations to bring down temperature. And what I can look at here is what's being contemplated in this rod. I'm not looking at larger issues about congressional decisions taken a long time ago. I'm not looking at exceedances that may have been in place prior to this rod. I'm looking at what this rod authorizes. And when I look at that and I look at the question of whether we're dealing – whether we've got operations that are in violation, I'm not seeing that. This is consistent with the Corps' Clean Water Act obligations here. One more. You want to have – you or your other – One more naive question. All right. If you brought a Clean Water Act action, would you then be faced with a problem that you'd be violating the Endangered Species Act because you'd endanger the salmon because in trying to satisfy the Clean Water Act, it might not work for the salmon? In other words, see, it keeps going back and forth on me. And now when we've taken so-called – if the salmon and all this side works, we've got a problem with the Clean Water Act. But if you flop over and try to do a Clean Water Act action, what does that do to all the decisions you've made on this side under the Endangered Species Act? Well, I think the Corps has said this on the record, that there's clearly an issue with trying to balance those competing obligations, particularly in the area of total dissolved gas. And trying to make it all work and all come together because there are so many considerations here is a real concern. They focused on it more in the total dissolved gas area. I don't think we're quite at that point in the temperature area yet. But that is one of the many things that the Corps has to juggle here in looking at how it's going to operate these dams that Congress says it has to operate. All right. Thank you. I think we'll add the potlatch to the mix now. Thank you. As always happens, you should never let the other person go first because they use up all your time and it invariably happens. But we're going to give you an extra minute or so so that you'll have some time to be able to talk with us. If the Court can add a minute to her time. Good morning, Your Honors. Thank you. May it please the Court. My name is Lori Beal. I'm with the law firm Stowell Reeves. And I'm here on behalf of several intervener groups who rely on the use of the river. Your Honors, there seems to be significant confusion as to what is the legal issue presented.  I'm going to start with the issue of subject matter jurisdiction. Congress did not intend to create what this is. It's essentially a hybrid claim. It's an enforcement action. How can you tell if the Court is violating a water quality standard without getting that evidence into the record? No one's really discussed the Washington standard here. But significantly, it's not just a number where you go out and you measure the water temperature and say, oh, well, it's warmer than 20 degrees. The standard here is based on an incremental allowable increase of water temperature. And as I believe has been made evident, it's very complicated to establish what is the exact temperature impact of any particular source of heat, and heat in particular being something that's naturally present in the water, which is affected by atmospheric conditions and the river's flow rate and all kinds of other factors. It's not a matter of simply looking at administrative record and saying, well, can we tell from this record that there's more than a 0.3 degree? I've noticed that, that the water quality standards are dynamic. It's this thing that keeps changing, and that's why I got lost. Because if you try to set the Clean Water Act dynamics on this side and then try to match them with the endangered species on the other side, I'm not too sure you can make any of this work, very frankly. But the record, to me, is confusing because the Clean Water Act dynamics are different, it seems to me. Is that what you're trying to say? Well, what I'm trying to say is that there is, in fact, Congress did not intend to create this type of claim. This is, again, an APA case. In APA, you look at an agency's decision, was it arbitrary or capricious? That's not what the plaintiff's NWF is arguing. They're arguing that the court is violating a temperature standard. That's an enforcement question, and the Clean Water Act has a citizen suit enforcement provision, and it has a sovereign immunity waiver. But why doesn't the Oregon Natural Resources case, which basically says you can go through the APIN, these Clean Water Act violations or arguments under the APA, why doesn't that resolve the jurisdictional problem, which I think the court also agrees that there is jurisdiction? The ONRC case actually does not address any of the issues that we've raised. Frankly, it does not examine the language of Section 313, which is the sovereign immunity waiver. I don't believe ONRC even quotes the statutory language. If we look at that language and see what does it say, it requires that the court comply and is subject to all of the same federal, state, and local pollution control requirements in the same manner and to the same extent as a nongovernmental entity. And yet nonfederal dam operators are not subject to a cause of action to enforce water quality standards. There's competing precedent of this Court finding that water quality standards are not directly enforceable in the manner sought to be imposed in this case. All right. Thank you. We will take a good look at that case as well as our other precedent to resolve first the jurisdiction issue, obviously. I'll hear from the National Wildlife Federation. And as with the Corps, your friend ate up the rest of your time, but you ate up most of his to begin with. That's right. We'll give you a minute and a half rebuttal. Thank you, Your Honor. I want to correct a factual misstatement of Ms. Quast's first. She said that the Corps' natural river operations involve breach. That is not the case. It is an operational strategy. And if you look at the record at ER 164 at 428, that's clear. So it is not a breaching operation that we're talking about as an operational alternative. I think in answer to some of Judge Brunetti's concerns that I would suggest that it's not unusual for a federal agency to have to comply with several statutes at the same time in making decisions. And what we have in this case is a history of the Army Corps ignoring entirely its Clean Water Act responsibilities until ordered by the district court in February of 2001 to do that and then turning to those Clean Water Act responsibilities. I do not think that there is a conflict here between the Endangered Species Act and the Clean Water Act. As I said earlier, I think the Endangered Species Act is giving us a floor to what these salmon are going to need to survive. But it's certainly not saying what else and what more needs to be done to comply with other obligations, especially those to have the clean water necessary. And we're talking about temperature here, not something where you could do harm to the salmon by trying to do good. I also think that it's important to go look and see what the Corps decided. The quote is that we conclude that the operation of the Corps' dams is not causing temperature exceedances. And that is belied by the information in the record that we've – that I talked about earlier and that are quoted in our briefs. Also, Judge Gould, when Judge Pry sent this case back down the first time, she said they haven't considered their temperature – their Clean Water Act duties. She also said, and she specifically found, that there is evidence in the record that the Corps is causing exceedances of temperature. And that was where the decisions for 95 and 98. And there is – The Corps is causing or that the dams are causing? The Corps is causing, that the Corps' operations are causing. And that's quoted in our briefs as well. And there is nothing in the record then between the judge's decision in February of 2001 and this decision we're talking about here that – that undercuts that. Thank you, Your Honors. Well, here's my question. It gets back to the jurisdictional thing and this ONRC issue. In this kind of proceeding, I think that there can't be, like, a hearing and findings of fact made in the district court. It's just a review on the administrative record. So is it sort of like the question is whether the – can we say the question is whether the Corps' view of its legal obligations under the state standard are arbitrary and capricious without a factual determination? I think you can, Your Honor, given the Corps' admission that there is a temperature shift caused by the dams. Based on looking what's in the – What's in the record and the EPA model and the operational changes that can be made. I think there was stuff in the administrative record looking in each opposite direction. Then what's – then what's the answer under the Administrative Procedure Act? If the Corps' decision is supported by administrative record evidence, then the Corps would be correcting its decision. But that is exactly what we don't have here. Thank you. The case of National Wildlife Federation versus the Army Corps of Engineers is submitted. I want to thank both counsel – or all counsel. The briefs are excellent. You might not have divined that from our questions, but I think that they've really raised the issues quite well. So thank you for the arguments and for the briefing. The next case will – United States versus Bayer. And one of the counsel will appear via video. So we won't be taking a break, but we will be setting up the video. Do you want to take a break? I'm going to be able to see the video. We're going to move it. Yeah. They were just trying to – Yeah, this is sort of a new deal here, so. So how long is this? This is 10 and then a 20-minute. She's the same one. Okay. I'm okay for the 10s. Then let's – Okay. No. Okay. Okay. Okay. This is grueling, but at least we got something about the fishing with the memorial to President Reagan. That's true. He was scheduled for Friday. Who would have guessed they were calling everything? I don't know who the people are. There's other panelists. I don't know who they are. There's another panel in Nakamura City, Freddie. Right, I know. They have a funny schedule. The chief's email. He's flying back to L.A. tonight. Tonight, yeah. The chief's email. Yeah, that's what I'm saying. I didn't see the chief's email. It was yesterday? It was sent yesterday. Do you think most panels in the circuit are calling off? I doubt it. I doubt it. It's hard to reschedule. Yeah. It's too hard to reschedule. We're okay. You're a genius. You anticipated that. I don't know how. It is spooky. All right. All right. Hello. Yes, we saw your photos, Mr. Avery. Very nice. Hopefully you can stay awake for 20 minutes. Thank you also for accommodating the video argument of your opposing counsel. Thank you. All right. Thank you. Thank you. Thank you. Are we going to be moderating? Those at your desk. Yeah. No. Hello. Ms. Hurd, can you hear us? Yes, I can. All right. We'll call for argument.
judges: Brunetti, McKeown, Gould